CRAIG FOSTER FORD, INC., Appellant,

v.

IOWA DEPARTMENT OF TRANSPORTATION, Appellee,

and

Ford Motor Company, Intervenor–Appellee.

No. 95–1802.

Supreme Court of Iowa.

April 23, 1997

---

William D. Scherle of Hansen, McClintock & Riley, Des Moines, for appellant.

Thomas J. Miller, Attorney General, David A. Ferree, Special Assistant Attorney General, and Carolyn J. Olson, Assistant Attorney General, for appellee Iowa Department of Transportation.

Wade R. Hauser III of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines, and Howard S. Harris, Dearborn, Michigan, for intervenor-appellee Ford Motor Company.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, NEUMAN, and ANDREASEN, JJ.

NEUMAN, Justice.

This appeal concerns Iowa's motor vehicle franchise law, Iowa Code chapter 322A (1993). Before a car manufacturer can terminate a franchise in Iowa, the franchiser must establish (1) good cause for termination and (2) proof that "another franchise in the same line-make will become effective in the same community." Iowa Code § 322A.2. The Iowa department of transportation (DOT), affirmed on judicial review by the district court, concluded that the disreputable business practices of plaintiff Craig Foster Ford, Inc., justified Ford Motor Company's termination of its franchise, and that Ford's good-faith intent to secure another franchisee for the community satisfied the statutory replacement requirement. Finding no error, we affirm.

I. *Background Facts and Proceedings.*

Craig Foster Ford, Inc., owned and operated by Craig Foster,[1] is the authorized Ford car and truck dealership serving the communities of Tripoli and Readlyn, Iowa. By all accounts it is a thriving small-town dealership. Reports of actual sales at the time this suit commenced exceeded by almost tenfold the estimates Foster and Ford projected when they entered into the franchise agreement in 1984.

As a Ford franchisee, Foster actively participated in marketing programs designed to give dealers cash incentives to move out certain models at certain times and to attract buyers with offers of cash rebates. Standard eligibility rules governed these sale programs. In particular, the rules defined eligible vehicles and buyers, with limits placed on the duration of promotional periods. To facilitate these promotions and reduce paperwork, Ford authorized its dealers to issue universal bank drafts for rebates offered in connection with new-vehicle purchases. While a buyer could convert such drafts to cash, in practice the buyer would endorse the draft over to the dealer, applying the proceeds to the purchase of a vehicle.

An audit for the period August 1989 to August 1991 revealed forty instances in which Foster reported sales falling within eligibility dates when, in fact, the sales were not actually made during the period. In eleven of the incorrectly reported sales, the named "buyers" were actually Foster Ford employees, not bona fide buyers. These false reports resulted in rebate payments by Ford exceeding $25,000.

In twenty out of the twenty-six incorrectly reported sales involving cash rebates, Craig Foster issued universal bank drafts payable to the named "customer" and then endorsed the drafts in the payee's name, depositing the drafts in Foster's own bank account. Moreover, in thirty-four other instances when dates *were* correctly reported and rebates were authorized, the audit revealed that the customers were unaware of Foster's endorsement of the rebate checks made payable to them. Complaints by these customers led to the audit.

The audit results prompted Ford to notify Foster in writing of its intent to terminate their franchise agreement. The parties' contract authorized termination or nonrenewal of the franchise upon

---

1. For simplicity we will refer to the dealership and owner collectively as "Foster."

[a]ny submission by the Dealer to the Company of any false or fraudulent application or claim ... for wholesale parts or VEHICLE sales incentives or for any other refund, credit, rebate, incentive, allowance, discount, reimbursement or payment under any Company program....

Foster admitted that he submitted falsified sales information to Ford in order to claim dealer and customer cash incentives. When asked whether he forged endorsements on rebate checks, however, he claimed a Fifth Amendment privilege not to answer. He defended his conduct by claiming that Ford encouraged or condoned deceptive practices in the following ways: Ford zone managers exerted pressure to keep sales high; Foster sometimes received advance notice of sales incentive programs; other dealers discussed "bending the rules"; one Ford representative encouraged him to forward sales cards early because "numbers were needed"; other dealerships sold vehicles contrary to the rules without consequences imposed by Ford.

Upon Foster's protest, Ford sought approval of the termination by the DOT in accordance with Iowa Code section 322A.6. Following a contested hearing before an administrative law judge (ALJ), the division of inspections and appeals granted Ford's application. *See* Iowa Code § 322A.7. Foster appealed to the DOT, where the ALJ's decision was adopted in full.

Foster then sought judicial review in accordance with Iowa Code section 322A.17.[2] Ford intervened. The district court affirmed the DOT's decision to permit termination of the franchise. Foster appealed. Further facts will be detailed as they pertain to the issues raised on appeal.

### II. *Scope of Review.*

■ When reviewing final agency decisions, the district court acts in an appellate capacity to correct errors of law. *Harrington Trucking, Inc. v. Iowa Dep't of Transp.*, 526 N.W.2d 528, 529 (Iowa 1995); *see* Iowa Code § 17A.19. Our task on appeal is, like-

wise, to correct errors of law. *Harrington Trucking*, 526 N.W.2d at 529.

■ On matters of statutory interpretation, we give only limited deference to agency rulings. *Civil Serv. Comm'n v. Iowa Civil Rights Comm'n*, 522 N.W.2d 82, 86 (Iowa 1994); *see also McCormick v. North Star Foods, Inc.*, 533 N.W.2d 196, 198 (Iowa 1995) ("Issues of law are determined by the court, and we give only limited deference to the interpretation of an administrative agency.").

■ On factual matters, we are obliged to uphold the agency's findings if supported "by substantial evidence in the record made before the agency when that record is reviewed as a whole." Iowa Code § 17A.19(8)(f); *accord Pointer v. Iowa Dep't of Transp.*, 546 N.W.2d 623, 625 (Iowa 1996). Evidence is substantial if a reasonable mind could accept it as adequate to reach the same findings made by the agency. *Pointer*, 546 N.W.2d at 625; *Reed v. Iowa Dep't of Transp.*, 478 N.W.2d 844, 846 (Iowa 1991).

■ To the extent constitutional issues are raised on appeal, our review is de novo. *Soo Line R.R. v. Iowa Dep't of Transp.*, 521 N.W.2d 685, 688 (Iowa 1994).

### III. *Issues on Appeal.*

Foster's appeal urges two principal grounds for reversal. It first contends the agency (and district court) misinterpreted Iowa Code section 322A.15—the guidelines for determining "good cause" for termination under section 322A.2—by failing to accord equal weight to the eight statutory factors. Second, Foster claims Ford furnished insufficient proof that another Ford franchise "will become effective in the same community" as required by Iowa Code section 322A.2.

■ A. *Guidelines.* We note at the outset that Ford's dispute with Craig Foster involves more than a simple breach of their franchise agreement. The preamble to Iowa's motor vehicle franchise Act plainly states that "proper motor service is impor-

---

**2.** Under Iowa Code § 322A.17, review "may be sought in the manner provided for in section 322.10." Iowa Code § 322.10 states that "[j]udicial review of actions of the department may be sought in accordance with the terms of the Iowa administrative procedure Act," *i.e.*, Iowa Code § 17A.19.

tant to highway safety." 1970 Iowa Acts ch. 1160. Thus chapter 322A was enacted "to assure the public that motor vehicle franchisers would not, without good cause, terminate or discontinue dealerships or open additional dealerships in any Iowa community." *Beckman v. Carson*, 372 N.W.2d 203, 207 (Iowa 1985). In other words, if a franchiser introduces its new vehicles to an Iowa market, it must ensure that consumers retain continued access to dealer service.

So it is that, under the Act, a franchiser cannot terminate a franchise based on contract principles alone. Two criteria must be established in order to secure agency approval for the termination. Section 322A.2 states the requirements:

**322A.2  Discontinuing Franchise.**

Notwithstanding the terms, provisions or conditions of any agreement or franchise, no franchiser shall terminate or refuse to continue any franchise unless the franchiser has first established in a hearing held under the provisions of this chapter, that:

1. The franchiser has *good cause* for termination or noncontinuance, and

2. Upon termination or noncontinuance, *another franchise in the same line-make will become effective in the same community, without diminution of the motor vehicle service formerly provided*
. . . .

Iowa Code § 322A.2 (emphasis added). The franchiser carries the burden of proof in establishing these two provisions. *Id.* § 322A.9.

The controversy before us centers on the agency's application of the statutory guidelines in determining whether good cause has been established for terminating the franchise. Section 322A.15 sets forth factors the agency must consider:

**322A.15  Guidelines.**

In determining whether good cause has been established for terminating or not continuing a franchise, the department of inspections and appeals shall take into consideration the existing circumstances, including, but not limited to:

1. Amount of business transacted by the franchisee.

2. Investment necessarily made and obligations incurred by the franchisee in the performance of the franchisee's part of the franchise.

3. Permanency of the investment.

4. Whether it is injurious to the public welfare for the business of the franchisee to be disrupted.

5. Whether the franchisee has adequate [facilities and personnel to service vehicles].

6. Whether the franchisee refuses to honor warranties of the franchiser to be performed by the franchisee, provided that the franchiser reimburses the franchisee for such warranty work performed by the franchisee.

7. [F]ailure by the franchisee to substantially comply with those requirements of the franchise which are determined by the department of inspections and appeals to be reasonable and material.

8. [B]ad faith by the franchisee in complying with those terms of the franchise which are determined by the department of inspections and appeals to be reasonable and material.

Iowa Code § 322A.15.

During a three-day hearing, Foster developed a strong and favorable record concerning factors (1) through (6). The record reveals that the volume of motor vehicles sold at Foster Ford greatly exceeded projected sales. From an initial investment of $50,000, Foster has built a $300,000 facility which includes an expanded show room, storage, and display lots. Foster has invested in equipment and training for personnel. The dealership plays a significant role in the life of Tripoli's small business community, and termination will likely result in unemployment. Foster provides adequate service by trained personnel, and there was no evidence of failure to honor any warranty.

The ALJ nevertheless placed greater emphasis on proof submitted by Ford on factors (7) and (8). Based on the facts sketched earlier in this opinion, the ALJ found a failure by Foster to substantially comply with

reasonable and material terms of the parties' franchise agreement relating to reputable business practices. Its assessment of Foster's actions, affirmed by the district court on judicial review, included findings that Foster's false rebate reporting and endorsement of bank drafts without customers' knowledge evidenced bad faith bordering on fraud. These findings enjoy substantial support in the record and are not seriously contested by Foster.

Foster's dispute lies with the emphasis accorded factors (7) and (8) by the ALJ and district court. The dealership insists on appeal that each of the eight factors should carry equal weight, thus giving it a winning score of six to two. Foster's tally makes little sense, however, where the defining interests are, on the one hand, profitability, and, on the other hand, good faith and fair dealing. At least one other court has observed in similar circumstances that positive factors—such as increased sales—cannot outweigh findings of pervasive fraud in a dealership's service department. *Chesapeake Ford, Inc. v. Ohio Motor Vehicle Dealers Bd.*, 103 Ohio App.3d 515, 660 N.E.2d 481, 485 (1995).

We are convinced that section 322A.15 calls for a qualitative rather than quantitative analysis. Rather than saying each factor shall be given equal weight, the section directs the agency to "take into consideration the existing circumstances, including, but not limited to" the enumerated guidelines. Iowa Code § 322A.15. Use of such flexible statutory criteria enables the law to address two different circumstances under which termination might be sought by a franchiser. A poor showing on factors (1) through (6) would signal financial and service weaknesses, problematic for the franchiser and public alike. Factors (7) and (8), by contrast, would reveal a breakdown in the parties' good-faith adherence to the terms of their franchise. Failure of performance on any one or more of the factors would be detrimental to a sound business relationship operated in the public interest. *Cf. Wheeler v. Waller*, 197 N.W.2d 585, 587 (Iowa 1972) (in dispute by real estate brokers over commission, "duty of good faith is not limited to the familiar categories such

as partnership, joint venture, and agency; it permeates the law wherever a relationship of trust and confidence exists").

■ Our task in interpreting the statute is to give effect to the intention of the legislature. *Iowa Dep't of Transp. v. Iowa Dist. Ct.*, 540 N.W.2d 40, 42 (Iowa 1995). Nothing in section 322A.15 suggests a legislative intent to reward profitability achieved by unscrupulous means. The ALJ and district court correctly rejected Foster's argument to the contrary.

■ Foster claims in the alternative that Ford should be equitably estopped from seeking termination of the franchise because Foster relied to its detriment on Ford's pressure to "bend the rules" to increase inventory and sales. The claim is entirely without merit. It is axiomatic that "[a] person whose own conduct or default got him into his predicament cannot successfully urge estoppel." *Johnston v. State Bank*, 195 N.W.2d 126, 130 (Iowa 1972). Even if the record supported the claims of impropriety urged by Foster, which it does not, the dealership is a poor candidate for equitable relief. The law will not permit Foster to benefit from its own wrongdoing. *See DeWall v. Prentice*, 224 N.W.2d 428, 432 (Iowa 1974).

■ Finally, we reject Foster's contention that the agency's findings were tainted by adverse inferences drawn from Foster's refusal to admit forgery in connection with customer bank drafts. It is true, of course, that the Fifth Amendment to the United States Constitution protects citizens from compelled self-incrimination. *Baxter v. Palmigiano*, 425 U.S. 308, 317, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810, 820 (1976). Moreover, it would be unconstitutional in a *criminal* trial for a court to instruct a jury that adverse inferences could be drawn from a defendant's silence. *Id.; State v. Morrison*, 368 N.W.2d 173, 175 (Iowa 1985). Such adverse inferences are not constitutionally off limits in *civil* cases, however. *Baxter*, 425 U.S. at 318, 96 S.Ct. at 1558, 47 L.Ed.2d at 821. "[A] trial court may infer in a civil case from a party's refusal to answer based on a claim of privilege against self-incrimination that the answer would be adverse to the

party." *Eldridge v. Herman,* 291 N.W.2d 319, 322 (Iowa 1980).

In sum, Foster has failed to overcome as a matter of law the district court's factual findings supporting the "good cause" test for termination under section 322A.2. Nor has Foster persuaded us that section 322A.15 calls for a quantitative, rather than qualitative, analysis of the guidelines underlying the court's decision. We therefore turn to its argument concerning the second requirement of section 322A.2, establishment of a new franchise.

■ B. *New franchise.* At trial Ford submitted data supporting its view that a new Ford dealership would enjoy success in Tripoli. Ford representatives also testified to their good-faith intention to secure a new franchisee as soon as this litigation is concluded. Foster claims on appeal, as it did at trial, that Ford's good intentions are insufficient, as a matter of law, to satisfy the "will become effective" language of section 322A.2. We disagree.

The district court—as well as the ALJ before it—noted the impracticality of literal conformity with section 322A.2 in the context of a contested franchise termination. This very controversy—commenced over five years ago—highlights the dilemma. The hearing at which Ford expressed its good-faith intention to obtain a new dealership took place four years ago. Foster has drawn the case out with three appeals since that hearing. Strict adherence to the language of section 322A.2 would have required Ford to have a replacement dealer with a facility in the local community standing by for years, ready to commence operations at the moment Foster gives up the case or exhausts its litigation options.

We presume that the legislature, in enacting section 322A.2, intended a just and reasonable result. Iowa Code § 4.4(3); *State v. Lewis,* 514 N.W.2d 63, 69 (Iowa 1994); *Brinegar v. Iowa Dep't of Revenue,* 437 N.W.2d 585, 586 (Iowa 1989). Because strict adherence to the common meaning of the statutory term "will" would lead to an unreasonable, impracticable and absurd result, we are compelled to search for an alternate meaning consistent with the legislature's pur-

pose. *Holiday Inns Franchising, Inc. v. Branstad,* 537 N.W.2d 724, 728 (Iowa 1995). We believe proof of a good-faith intention to establish a new franchise furthers the evident legislative purpose of section 322A.2. Substantial evidence in the record supports such a finding here. We therefore affirm the decision of the district court.

**AFFIRMED.**